IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| PATRICK BURNETT, <br><br>                    Plaintiff, <br><br>-against- <br><br>CORE SERVICES GROUP, INC., <br><br>                    Defendant. | Civil Docket No.: 19-cv-1456 <br><br>**COMPLAINT** <br><br>Jury Trial Demanded |

Patrick Burnett, by and through his attorneys, The Legal Aid Society and Washington Square Legal Services, for his complaint against CORE Services Group, Inc., alleges as follows:

**NATURE OF THE ACTION**

1. Plaintiff Patrick Burnett ("Mr. Burnett" or "Plaintiff") brings this action against Defendant CORE Services Group, Inc. ("CORE" or "Defendant") for its unlawful termination of his employment in violation of Federal, New York State, and New York City laws that protect individuals with conviction records from employment discrimination.

2. CORE violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681b(b)(3)(A), by firing Mr. Burnett before giving him a reasonable period of time and meaningful opportunity to respond to a report concerning his conviction record.

3. CORE violated the New York City Fair Chance Act, N.Y.C. Admin. Code § 8-107(11-a)(b)(ii)-(iii), by withdrawing its conditional offer of employment because of his conviction record before undertaking and providing the written analysis required by that Act, giving Mr. Burnett a reasonable period of at least three business days to respond to the written analysis, and holding the position open for Mr. Burnett during that reasonable period.

1

4. CORE also violated Article 23-A of the New York Correction Law as incorporated into the New York State Human Rights Law, N.Y. Exec. Law § 296(15), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(10), by terminating Mr. Burnett's employment based on his conviction record without performing the analysis required by that section.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over Mr. Burnett's FCRA claim pursuant to 15 U.S.C. § 1681p and 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Mr. Burnett's New York State and New York City claims pursuant to 28 U.S.C. § 1367.

6. Plaintiff's New York State and New York City claims are so closely related to the FCRA claims that they form part of the same case or controversy under Article III of the United States Constitution.

7. Venue is proper in the Eastern District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because CORE is headquartered and resides in this district and because the events and omissions giving rise to the claims alleged herein occurred, in substantial part, in this District.

## PARTIES

8. Mr. Burnett is a resident of Brooklyn, New York.

9. On information and belief, CORE is a domestic not-for-profit incorporated and headquartered in Kings County, New York. On information and belief, CORE has four or more employees and thus is an employer within the meaning of the New York State Human Rights Law and the New York City Human Rights Law.

## FACTS

**Mr. Burnett's application and hiring**

10. In late 2017, Mr. Burnett applied online to CORE for the position of Director of Social Services at Bergen House Senior Transitional Shelter for Men ("Bergen House").

11. Bergen House is a homeless shelter operated by CORE, housing men aged 62 and older.

12. The Director of Social Services at Bergen House supervises staff and oversees the social services provided to the residents. These services include case management, assistance obtaining entitlements, referrals to community-based partners, and referrals to permanent housing.

13. Mr. Burnett was qualified for the position, having a master's degree in social work and many years of experience in the field.

14. On January 10, 2018, CORE extended an offer of employment to Mr. Burnett, conditional on the results of a criminal background check. Mr. Burnett accepted the offer in writing on the same day.

15. As agreed, Mr. Burnett began working at Bergen House on January 22, 2018. He performed his job duties satisfactorily.

**Receipt of the background check and firing**

16. On January 24, 2018, Mr. Burnett's third day of employment at CORE, CORE's human resources provider, Zenefits, emailed Mr. Burnett's criminal background check to CORE and to Mr. Burnett. The email stated that if Mr. Burnett believed that any information in the background check was inaccurate, he should email Checkr, the background check administrator, to request that Checkr update the background check with the correct information. The email did

3

not contain information regarding how or to whom Mr. Burnett could provide evidence of rehabilitation or any additional information he sought for CORE to consider. The email also did not contain information regarding the length of time, if any, that CORE would wait before taking adverse action because of the background check.

17. The background check listed convictions in two prior criminal cases against Mr. Burnett, filed on November 29, 1994 and February 3, 2016. The November 29, 1994 case related to Mr. Burnett's payment of his bills using fraudulent gift cards. The February 3, 2016 case related to Mr. Burnett's possession of fraudulent gift cards.

18. At around 6:00 p.m. on January 24, 2018, after Mr. Burnett had returned home from work, the Director of Bergen House called him on his cell phone. The Director instructed Mr. Burnett to meet with CORE's Chief Executive Officer, Jack Brown, at 9:00 a.m. the following morning. The Director did not tell Mr. Burnett what the meeting would be about.

19. On information and belief, at the time the Director called Mr. Burnett, CORE had already made the decision to fire him and had made that decision without analyzing the eight factors that Article 23-A of the New York Correction Law requires an employer to consider.

20. Mr. Burnett met with Mr. Brown on January 25, 2018, as instructed. At this meeting, which lasted about fifteen minutes, Mr. Brown showed Mr. Burnett a printout of his background check and told him not to return to work. In sum and substance, Mr. Brown told Mr. Burnett that his 2016 conviction signified that it would not be appropriate for him to serve as CORE's Director of Social Services.

21. During the January 25, 2018 meeting, CORE terminated Mr. Burnett's employment and withdrew the conditional offer of employment it had made to Mr. Burnett. A letter dated February 26, 2018 from Wendy S. Weingart, Vice President and General Counsel of

CORE, to Mr. Burnett's counsel states that "on January 25, 2018 Mr. Burnett was terminated as the Director of Social Services at Bergen House."

22. Prior to terminating Mr. Burnett's employment, CORE did not provide Mr. Burnett with a reasonable period of time or meaningful opportunity to respond to the contents of the background check, did not perform the eight-factor analysis required by Article 23-A of the New York Correction Law, did not provide Mr. Burnett with a written copy of such analysis, did not give Mr. Burnett a reasonable time of at least three business days to respond to the analysis, and did not keep the job open for him during that time.

**Mr. Burnett's criminal convictions and rehabilitation.**

23. The first offense listed on the background check occurred in or around November 1994, approximately 23 years in the past. Mr. Burnett was 29 years old at the time and, finding himself on the verge of homelessness, had purchased fraudulent gift cards and used them to pay his bills. The cards looked like pre-paid gift cards, but charged an unknown individual's credit card. Mr. Burnett was arrested and pleaded guilty to felony charges of forgery and financial transaction card fraud in Georgia. He was sentenced to five years of probation and restitution damages.

24. Following his conviction, Mr. Burnett sought to begin a career in which he could help others. He earned a bachelor's degree in psychology in 2000 from SUNY Buffalo, and a Master of Social Work from Long Island University in 2013. He had worked in the social services field since 2005, holding positions such as case manager and therapist at organizations including Community Counseling and Mediation of Brooklyn, Urban Dove Team Charter High School, and Services for the UnderServed. In many of these positions he assisted clients in putting together applications for housing, employment, and public benefits.

25. In or around May 2015, Mr. Burnett fell ill with meningitis. He was hospitalized for approximately six weeks and thereafter was required to complete a multi-week rehabilitation program. During this time, he accumulated a substantial hospital bill. Moreover, as a result of his prolonged hospital stay and rehabilitation, he was unable to work. In or around June 2015 his employer advised him that it would not be renewing his contract.

26. After Mr. Burnett left the hospital, he was unable to find another full-time job. Instead, he worked part-time as a family team meeting coach and facilitator, accepting referrals from community-based, faith-based, and juvenile justice organizations.

27. In December 2015, Mr. Burnett grew increasingly desperate to pay his accumulating bills. He purchased fraudulent gift cards of the same nature as those he had purchased in 1994, but he never used the cards or resold them.

28. About two months later, on February 3, 2016, Mr. Burnett's car got stuck on a traffic island. Before a tow truck could assist Mr. Burnett, a police officer searched his car, found the fraudulent gift cards, and arrested him. Mr. Burnett pleaded guilty to criminal possession of a forged instrument in the second degree and was sentenced to five years of probation.

29. Following his conviction, he fully complied with the terms of his probation. In or around December 2016, his probation level was reduced to the least intensive level of supervision, and he was permitted to report to a kiosk rather than a probation officer. In or around August 2018, he was discharged from probation approximately two-and-a-half years early for good behavior.

30. Mr. Burnett also continued to advance in his career after this arrest. From in or around November 2016 to in or around November 2017, he worked as a Senior Case Manager at a homeless shelter run by Services for the UnderServed ("SUS"). From in or around December

6

2017 to in or around January 2018 he served as a Case Manager at CAMBA, another social services organization. He resigned from CAMBA to accept the job at CORE, which offered a more professionally fulfilling supervisory role and a higher salary.

31. If CORE had given him a meaningful opportunity to respond to the background check before he was fired, Mr. Burnett would have explained the circumstances surrounding his February 2016 conviction, as well as his rehabilitation and remorse. Mr. Burnett would also have explained that the skills he gained during his years working in social services, his commitment to CORE's mission, and the fact that he comes from a background similar to that of CORE's homeless clients made him uniquely qualified to serve as CORE's Director of Social Services.

32. If CORE had given Mr. Burnett an opportunity to respond to the background check before he was fired, and if CORE had analyzed the eight factors that Article 23-A of the New York Correction Law requires, it would have determined that there is no direct relationship between Mr. Burnett's convictions and the position for which he had been hired, and that employing him would not involve an unreasonable risk to people or property and, therefore, would not have terminated him.

**Mr. Burnett's economic loss and emotional distress**

33. After CORE fired him on January 25, 2018, Mr. Burnett suffered economic loss. He was unable to find work until April 2, 2018, when he started work as a social worker with a social services organization. His salary at the social services organization is lower than his salary at CORE.

34. In addition, as a result of CORE's firing him because of his conviction record, Mr. Burnett has suffered emotional distress.

**First Cause of Action**

**Failure to Provide Reasonable Time and Opportunity to Respond to the Criminal Background Check in Violation of the Fair Credit Reporting Act**
**(15 U.S.C. § 1681b(b)(3)(A))**

35.　Mr. Burnett realleges and incorporates by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

36.　Pursuant to the FCRA, 15 U.S.C. § 1681b(b)(3)(A), before taking any adverse action based in whole or in part on a consumer report used for employment purposes, the person intending to take such adverse action must provide the consumer a copy of the report and a written description of their rights, and *must afford the consumer a reasonable period of time and meaningful opportunity to respond*.

37.　CORE is a "person" as defined by the FCRA in 15 U.S.C. § 1681a(b).

38.　The criminal background check that CORE relied on is a "consumer report" within the meaning of 15 U.S.C. § 1681a(d).

39.　CORE's termination of Mr. Burnett's employment based in whole or in part on information contained in his criminal background check is an "adverse action" within the meaning of 15 U.S.C. § 1681a(k)(1)(B)(ii).

40.　CORE, by its own admission, terminated Mr. Burnett the day after its human resources provider emailed Mr. Burnett his criminal background check.

41.　CORE fired Mr. Burnett at a meeting scheduled and controlled by CORE. Mr. Burnett received the instruction to attend the meeting at approximately 6:00 p.m., only hours after CORE's human resources provider emailed Mr. Burnett the background check. CORE scheduled the meeting for the following morning at 9:00 a.m. CORE did not advise Mr. Burnett about the purpose of the meeting until the meeting began.

42. In doing so, CORE took adverse action against Mr. Burnett before it provided him with a reasonable period of time or meaningful opportunity to respond to the contents of the report.

43. On information and belief, if CORE had given Mr. Burnett a reasonable period of time and meaningful opportunity to respond to the contents of the report, it would not have fired him.

44. CORE acted unreasonably in violating the FCRA. The Federal Trade Commission ("FTC") has long interpreted § 1681b(b)(3)(A) to prohibit employers from taking adverse action against an applicant or employee unless a "reasonable period" has elapsed since the time the employer provided the consumer report to the applicant or employee. *See* Fed. Trade Comm'n, *40 Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report with Summary of Interpretations* (July 2011), at 52 & n.68 (citing Weisberg, FTC Informal Staff Opinion Letter, June 27, 1997; Hawkey, FTC Informal Staff Opinion Letter, Dec. 18, 1997; Coffey, FTC Informal Staff Opinion Letter, Feb. 11, 1998; Lewis, FTC Informal Staff Opinion Letter, June 11, 1998).

45. Although the FTC has made clear that the minimum length of time required to constitute a "reasonable period" will vary depending on the circumstances, the FTC has also stated that a period of five business days "appears reasonable." Weisberg, FTC Informal Staff Opinion Letter, June 27, 1997. Likewise, various district courts have held that § 1681b(b)(3)(A) requires an employer to give the applicant or employee a reasonable period of time to dispute or explain their consumer report, so as to have a meaningful opportunity to avoid losing a job for which they are qualified. *See, e.g.*, *Marchioli v. Pre-employ.com, Inc.*, No. CV171566JGBDTBX, 2017 WL 8186761, at *13 (C.D. Cal. June 30, 2017); *Magallon v. Robert*

*Half Int'l, Inc.*, 311 F.R.D. 625, 633-34 (D. Or. 2015). And, several district courts interpreting § 1681b(b)(3)(A)'s reasonable period of time requirement have identified five business days as constituting a reasonable period of time. *See, e.g.*, *Wright v. Lincoln Prop. Co.*, No. 15-3483, 2017 WL 386602, at *3 (E.D. Pa. Jan. 27, 2017); *Reardon v. ClosetMaid Corp.*, No. 2:08-CV-01730, 2013 WL 6231606, at *12-13 (W.D. Pa. Dec. 2, 2013).

46. On information and belief, CORE's actions also constituted a departure from the procedure recommended by Checkr, CORE's background check provider. Checkr advises employers to provide a "reasonable waiting period" of at least five business days or seven calendar days between providing the background check report and taking adverse action. Specifically, Checkr states, "The FCRA requires a reasonable amount of time (usually 7 calendar days, but some jurisdictions require more) before taking final action . . . . By default, Checkr's waiting period is set to 7 calendar days . . . . Most companies provide at least 5 business days or 7 calendar days to give the candidate opportunity to respond." See Checkr Help Center, *The Adverse Action process: deciding not to move forward with an applicant*, https://help.checkr.com/hc/en-us/articles/216873808-The-Adverse-Action-process-deciding-not-to-move-forward-with-an-applicant#pre-notice.

47. On information and belief, CORE's actions also constituted a departure from the procedure recommended by Zenefits, CORE's human resources provider. Zenefits advises employers to "work directly with Checkr to send a pre-adverse action notification that: Informs the individual that their application will be denied based on the report, Includes a copy of his/her background report and a copy of A Summary of Your Rights under the Fair Credit Reporting Act, and Provides a reasonable period of time to dispute the results." See Zenefits Help Center, *Can I change my hiring decision based on the results of the report?*,

https://help.zenefits.com/Hiring/FAQs_About_Background_Checks_in_Zenefits/015_Can_I_Change_My_Hiring_Decision_Based_on_the_Results_of_the_Report%3F/.

48. It was therefore unreasonable for CORE to fire Mr. Burnett one day after its third-party human resources provider emailed Mr. Burnett a copy of his consumer report, and without giving him a reasonable amount of time or a meaningful opportunity to explain its contents.

49. As a result of CORE's adverse action, Mr. Burnett suffered actual damages.

50. CORE's conduct, actions, and inactions were negligent, rendering CORE liable for actual damages, costs, and attorneys' fees in an amount to be determined by this Court, as provided in 15 U.S.C. § 1681o.

## Second Cause of Action

### Discrimination in Violation of Article 23-A of the New York Correction Law, as Incorporated into the New York State Human Rights Law
### (N.Y. Exec. Law § 296(15))

51. Mr. Burnett realleges and incorporates by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

52. The New York State Human Rights Law, N.Y. Exec. Law § 296(15), makes it unlawful discrimination to violate the provisions of Article 23-A of the New York Correction Law.

53. Article 23-A of the New York Correction Law, § 752, requires that employment not be denied or acted adversely upon because of an employee's conviction record or because of a finding of a lack of "good moral character" based on that conviction record, unless (1) there is a direct relationship between one or more of the convictions and the employment sought, or (2) continuation of the employment would involve an unreasonable risk to property or to the safety or welfare of specific individuals or the general public.

54. Article 23-A of the New York Correction Law, § 753, requires that in making an employment determination pursuant to § 752, employers must consider the following eight factors:

   a. The public policy of this state, as expressed in this act, to encourage the licensure and employment of persons previously convicted of one or more criminal offenses.

   b. The specific duties and responsibilities necessarily related to the license or employment sought or held by the person.

   c. The bearing, if any, the criminal offense or offenses for which the person was previously convicted will have on his fitness or ability to perform one or more such duties or responsibilities.

   d. The time which has elapsed since the occurrence of the criminal offense or offenses.

   e. The age of the person at the time of the occurrence of the criminal offense or offenses.

   f. The seriousness of the offense or offenses.

   g. Any information produced by the person, or produced on his behalf, in regard to his rehabilitation and good conduct.

   h. The legitimate interest of the public agency or private employer in protecting property, and the safety and welfare of specific individuals or the general public.

55. CORE violated N.Y. Correction Law § 753, and thus discriminated against Mr. Burnett in violation of the New York State Human Rights Law, N.Y. Exec. Law § 296(15), by terminating Mr. Burnett without having analyzed the eight factors.

56. A proper analysis of the eight factors makes clear that there is no direct relationship between Mr. Burnett's convictions and his employment and employing him would not involve an unreasonable risk to people or property. Therefore, CORE violated N.Y. Correction Law § 752, and thus discriminated against Mr. Burnett in violation of the New York State Human Rights Law, N.Y. Exec. Law § 296(15), by terminating Mr. Burnett based on his conviction record.

57. On information and belief, CORE would not have terminated Mr. Burnett's employment if it had properly analyzed the eight § 753 factors and if it had properly considered whether one of the § 752 exceptions applied.

58. As a result of Defendant's discrimination in violation of N.Y. Exec. Law § 296(15), Mr. Burnett is entitled to damages including for past and future lost wages and benefits, past and future emotional distress, attorneys' fees and costs of this action, and pre-judgment interest.

**Third Cause of Action**

**Discrimination in Violation of Article 23-A of the New York Correction Law, as Incorporated into the New York City Human Rights Law**
**(N.Y.C. Admin. Code § 8-107(10))**

59. Mr. Burnett realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

60. The New York City Human Rights Law, N.Y.C Admin. Code § 8-107(10), makes it unlawful discrimination to violate the provisions of Article 23-A of the New York Correction Law.

61. Article 23-A of the New York Correction Law, § 752, requires that employment not be denied or acted adversely upon because of an employee's conviction record or because of a finding of a lack of "good moral character" based on that conviction record, unless (1) there is a direct relationship between one or more of the convictions and the employment sought, or (2) continuation of the employment would involve an unreasonable risk to property or to the safety or welfare of specific individuals or the general public.

62. Article 23-A of the New York Correction Law, § 753, requires that in making an employment determination pursuant to § 752, employers must consider the eight factors laid out in paragraph 54.

63. CORE violated N.Y. Correction Law § 753, and thus discriminated against him in violation of the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(10), by terminating Mr. Burnett without having analyzed the specified factors.

64. A proper analysis of the eight factors makes clear that there is no direct relationship between Mr. Burnett's convictions and his employment and employing him would not involve an unreasonable risk to people or property. Therefore, CORE violated N.Y. Correction Law § 752, and thus discriminated against Mr. Burnett in violation of the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(10), by terminating Mr. Burnett's employment based on his conviction record.

65. On information and belief, CORE would not have terminated Mr. Burnett's employment if it had properly analyzed the eight § 753 factors and if it had properly considered whether one of the § 752 exceptions applied.

66. As a result of Defendant's discrimination in violation of N.Y.C. Admin. Code § 8-107(10), Mr. Burnett is entitled to damages including for past and future lost wages and benefits, past and future emotional distress, attorneys' fees and costs of this action, and pre-judgment interest.

67. Defendant engaged in discrimination against Mr. Burnett with willful or wanton negligence, or recklessness, or a conscious disregard of the rights of Mr. Burnett, or conduct so reckless as to amount to such disregard. As a result, Defendant is also liable for punitive damages. N.Y.C. Admin. Code § 8-502(a).

## Fourth Cause of Action

### Discrimination in Violation of the New York City Fair Chance Act, Part of the New York City Human Rights Law
### (N.Y.C. Admin. Code § 8-107(11-a)(b)(ii) and (iii))

68. Mr. Burnett realleges and incorporates by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

69. The New York City Fair Chance Act, N.Y.C. Admin. Code § 8-107(11-a)(b)(ii), requires that before an employer withdraws a conditional offer of employment because of an applicant's conviction record, the employer must perform an analysis of the applicant under Article 23-A of the New York Correction Law and must provide a written copy of said analysis to the applicant in a manner determined by the New York City Commission on Human Rights.

70. The New York City Fair Chance Act, N.Y.C. Admin. Code § 8-107(11-a)(b)(iii), requires that before an employer withdraws a conditional offer of employment because of an

15

applicant's conviction record, the employer must allow the applicant a reasonable time of at least three business days to respond to the written analysis provided pursuant to § 8-107(11-a)(b)(ii), and during this time must hold the position open for the applicant.

71. CORE violated the Fair Chance Act, N.Y.C. Admin. Code § 8-107(11-a)(b)(ii), by failing to perform the analysis required by Article 23-A of the New York Correction Law before it withdrew its conditional offer of employment and by failing to give Mr. Burnett a written copy of the analysis in a manner determined by the New York City Commission on Human Rights before CORE withdrew its conditional offer of employment.

72. CORE further violated the Fair Chance Act, N.Y.C. Admin. Code § 8-107(11-a)(b)(iii), by failing to give Mr. Burnett a reasonable time of not less than three business days to respond to the written analysis before it withdrew its conditional offer of employment and by failing to hold the position open for him during that reasonable period of time before it withdrew its conditional offer of employment.

73. On information and belief, CORE would not have withdrawn its offer of employment if before doing so it had (a) performed the eight-factor analysis required by Article 23-A of the New York Correction Law, (b) provided Mr. Burnett with a written copy of the analysis in a manner determined by the New York City Commission on Human Rights, (c) given him a reasonable time of at least three business days to respond to the analysis, and (d) kept the job open for him during that time.

74. As a result of CORE's violation of the New York City Fair Chance Act, N.Y.C. Admin. Code § 8-107(11-a)(b)(ii) and (iii), Mr. Burnett is entitled to damages including for past and future lost wages and benefits, past and future emotional distress, attorneys' fees and costs of this action, and pre-judgment interest.

75. Defendant engaged in discrimination against Mr. Burnett with willful or wanton negligence, or recklessness, or a conscious disregard of the rights of Mr. Burnett, or conduct so reckless as to amount to such disregard. As a result, Defendant is also liable for punitive damages. N.Y.C. Admin. Code § 8-502(a).

**WHEREFORE**, Mr. Burnett respectfully requests judgment granting the following relief:

a) A declaration that the actions complained of herein constitute violations of the FCRA, New York State Human Rights Law, and New York City Human Rights Law;

b) An order directing CORE to make Mr. Burnett whole for all earnings and benefits he would have received but for its violation of the FCRA, the New York State Human Rights Law, and the New York City Human Rights Law, including, but not limited to, lost wages, reinstatement (or front pay in lieu of reinstatement), and lost benefits, pursuant to the FCRA, 15 U.S.C. § 1681o; the New York State Human Rights Law, N.Y. Exec. Law § 297(9); and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-502(a);

c) Compensatory damages for emotional distress and suffering, pursuant to the FCRA, 15 U.S.C. § 1681o; the New York State Human Rights Law, N.Y. Exec. Law § 297(9); and the New York City Human Rights Law, N.Y.C. Admin Code § 8-502(a);

d) Punitive damages, pursuant to the New York City Human Rights Law, N.Y.C. Admin. Code § 8-502(a);

e) Attorneys' fees and costs, pursuant to the FCRA, 15 U.S.C. § 1681o; and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-502(g);

f) Prejudgment interest; and

g) Such additional relief as the Court may deem just and proper.

Dated:    March 13, 2019
          New York, NY

Respectfully submitted,

By: _____
THE LEGAL AID SOCIETY
Janet E. Sabel, Attorney-in-Chief
Justine M. Luongo, Attorney-in-Charge, Criminal Defense Practice
Karen Cacace, Director, Employment Law Unit
Melissa S. Ader, Of Counsel, Worker Justice Project
199 Water Street, 3rd Floor
New York, New York 10038
Telephone: (212) 577-3554
KCacace@legal-aid.org
MAder@legal-aid.org

Washington Square Legal Services, Inc.
Laura Sager
245 Sullivan Street, 5th Floor
New York, New York 10012
(212) 998-6442
Laura.sager@nyu.edu

*Attorneys for Plaintiff*